1  AZRA Z. MEHDI (220406)
   THE MEHDI FIRM, PC
2  One Market
   Spear Tower, Suite 3600
3  San Francisco, CA 94105
   (415) 293-8039
4  (415) 293-8001 (fax)
   azram@themehdifirm.com
5

6  Local Counsel for Plaintiffs and the [Proposed] Class
   [additional counsel listed on signature page]
7

8                       UNITED STATES DISTRICT COURT

9                      NORTHERN DISTRICT OF CALIFORNIA

10  JOSEPHINE WELLS and CATHERINE          )  Case No.:
    RENY, on Behalf of Themselves and All  )
11  Others Similarly Situated,             )  CLASS ACTION
                                           )
12                        Plaintiffs,      )  COMPLAINT
                                           )
13          vs.                            )
                                           )
14  UNILEVER UNITED STATES, INC., LEK      )
    INC., and CONOPCO, INC. d/b/a UNILEVER )  DEMAND FOR JURY TRIAL
15  HOME & PERSONAL CARE USA,              )
                                           )
16                        Defendants.      )
                                           )
17  _____)

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs Catherine Reny ("Reny") and Josephine Wells ("Wells"), through their undersigned counsel, for their Complaint against Defendants Unilever United States, Inc. ("Unilever"), LEK Inc. ("LEK"), and Conopco, Inc. d/b/a Unilever Home & Personal Care USA ("Conopco") (collectively, "Defendants") respectfully state as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action to seek redress for themselves and all others nationwide, other than residents of the states of Illinois, Alabama, Kentucky, Nevada or Wisconsin who purchased the Suave® Professionals Keratin Infusion 30 Day Smoothing Kit (the "Treatment" or "Product") from the date in 2011 that the Treatment was made available to consumers through the present. Plaintiffs purchased the Treatment because of Unilever's uniform false representation that it would smooth their hair and coat it with Keratin, a protein found naturally in hair. Unilever knew, but failed to disclose to Plaintiffs and the class, that the Treatment contains an ingredient or combination of ingredients that causes significant hair loss upon proper application. The active ingredient in the Treatment, Thioglycolic Acid, including its salts and esters, is the same active ingredient that is used in hair depilatories and some hair perming solutions. Based on testing conducted by Plaintiffs, and as evidenced by damage caused to Plaintiffs and the putative class members, the pH level and concentration of Thioglycolic Acid in the Treatment rendered it dangerous and unsafe for sale as an over-the-counter hair "smoothing" product.

2.      In addition, Defendants failed to properly warn consumers of the risks and dangers attendant to the use of such a strong depilatory agent on their hair and scalp — even well after Defendants knew or should have known of its hazards. Sometime in May 2012, Unilever decided to "recall" the Treatment, misleadingly characterizing it as a decision to "discontinue" selling the Product. Defendants' uniform acts and omissions in connection with the development,

marketing, sale and delivery of the Treatment, and its belated and incomplete "recall" of this hazardous Product, violate the various consumer protection laws of the State of California and multiple other states, breach express warranties to Plaintiffs and the class, violate product liability laws and constitute negligence and unjust enrichment.

3.     Unilever labeled, advertised, promoted and sold the Treatment targeting women who wanted smooth, shiny, manageable hair with no frizz. Through an extensive marketing campaign and via its website and packaging, Unilever made a number of express warranties: that the Treatment was a Keratin-based smoothing treatment and not a toxic chemical relaxer; that its effects would last no longer than 30 days; that it contained no Formaldehyde; and that it was safe. These warranties and representations are false. A copy of the Treatment's packaging, demonstrating these false representations, is below:



4.     The Treatment was marketed as a Keratin product although Keratin, which is a natural protein, is the last-listed ingredient in the Smoothing Cream and Cuticle Seal Cream. The Treatment was sold among hair conditioning products, although it is not a conditioner but is instead a chemical hair straightener.

5.     In addition, Unilever falsely claimed that the Treatment contained "No Formaldehyde," in all capital letters on the box cover, when in fact the Treatment contains a chemical ingredient that is known to release Formaldehyde upon its use or application.

6.     In order to create an impression of the Product as a gentle, natural Keratin-based hair "smoothing" treatment, Unilever falsely promoted the Product's effects as lasting no longer than 30 days. Unlike chemical hair straighteners, whose effects are expected to last for many months, the purportedly positive attributes to be provided by the Treatment were touted as short-term.

7.     Nowhere on the package labeling or on Unilever's websites or other marketing materials did Unilever warn Plaintiffs and members of the class that they were at risk of significant hair loss and/or scalp burns upon proper application of the Treatment. Unilever misled and deceived the public, and placed their customers in harm's way, all for the sake of increased profits.

8.     Unilever failed to warn Plaintiffs and members of the class of the risks, even though it knew, before or almost immediately upon introduction of the Product in late 2011, that consumers were complaining that the Treatment caused significant hair loss and scalp burns (among other adverse effects, such as hair discoloration). Indeed, hundreds of consumers posted on a Facebook page created to expose the devastating effects of this Product on the men and women who used it. A copy of the Facebook page entitled "Suave-Keratin-Infusion-Kit-Destroyed-my-Hair," is posted below:

CLASS ACTION COMPLAINT

3

9.      Not only did Unilever fail to properly warn consumers before they purchased the Product, but when it finally chose to "recall" the Product in May 2012, it told consumers the Product was being "discontinued" and was still safe to use, while at the same time directing retailers to immediately remove the Product from the shelves and send it back to Unilever. Other than a cursory instruction, Unilever did not follow up with the retailers, nor did it ensure that the Product was completely off the shelves.

10.      Up to the date of filing of this Complaint, Unilever has never fully and appropriately recalled the Product. Unilever continues to falsely claim to consumers that the Product is safe, and continues to fail to warn consumers of the dangers of application of the Treatment. Indeed, due to Unilever's failure to properly and appropriately recall the Product, the Product is still available for sale on Amazon.com. Moreover, because of Unilever's failure to advise consumers that the Product had been recalled because it was not safe to use — rather than a simple discontinuance — consumers continue to be at risk of buying and using the Product

while unaware of the significant safety risks Unilever continues to conceal. Unilever's website, pictured below, states that the Product was "discontinued" (although the U.S. Food and Drug Administration ("FDA") said it was recalled)[1] and falsely claims that it is still safe to use as directed.



11.     In addition to the hundreds or thousands of consumers who have complained to Unilever directly in the months leading up to the so-called recall, the filing of class actions and individual personal injury actions has provided Unilever with ample actual notice of the unsafe and defective nature of the Product to permit it to act in a comprehensive manner to prevent harm to consumers. Unilever has had ample opportunity to advise consumers of the risks of use of the Product, or to ensure that the Product is no longer available to consumers. Instead, it has done nothing to prevent future harm and has only exacerbated the harm by continuing to claim the Product is safe, while providing no further information to the public.

[1] *See* http://www.fda.gov/Safety/Recalls/EnforcementReports/ucm307229.htm, where the FDA indicates that the Treatment was recalled by Unilever by letter dated May 8, 2012.

CLASS ACTION COMPLAINT

5

1  12.  The following publicly-available photographs depict the type of damage caused
2  by the Product.





**Above two photos from my FOX Austin report "Dozens of women sue Unilever, claim hair product left bald spots" available at *http://www.myfoxaustin.com/story/23283501/dozens*-of-women-sue-Unilever-claim-hair-product-left-bald-sp.**

1
2
3
4
5
6
7
8
9



10
11
12
13
14
15
16
17
18
19



20
21

**Above two photos from https://www.facebook.com/pages/Suave-Keratin-Infusion-Kit-Destroyed-My-Hair/125404967583365.**

22       13.    Unilever's efforts to conceal and downplay the hundreds if not thousands of

23   complaints of Class Members who have lost their hair as a result of using this Product is a

24   pointed attack on consumers. Specifically, Unilever attempts to shift attention and blame from

25   the defects in the Product and its own failure to warn consumers by falsely claiming that it is the

26   consumers' "misunderstanding" of the appropriate use and application of the Treatment that has

27   resulted in the Product's failure.

28

CLASS ACTION COMPLAINT

7

14.     Consumers in the United States, and more particularly in California, reasonably expect that their hair care products will not cause significant hair loss because of defective design and manufacturing or because of inadequate research or due diligence. California and United States consumers had no expectation that the Treatment would cause scalp burns and cause their hair to fall out.

15.     Further, consumers reasonably expect that if Unilever, the company primarily responsible for developing, manufacturing, marketing and distributing the Product, knew that the Treatment would or could cause hair loss (whether by proper application or by misapplication), Unilever would make appropriate disclosures to consumers as soon as it determined there was a widespread problem, rather than quietly discontinuing the Product and attempting to conceal the problem. By downplaying, concealing and misrepresenting the Product and the safety and risks of its use, Unilever failed in its duty to provide consumers with adequate information, and continued even after the so-called "recall" — and to this day — to create and perpetuate a false public perception that there is little or no risk of harm from the use of its Product.

16.     In its continuing efforts to conceal the dangers and serious harm attendant to use of the Product, Unilever has also engaged in a campaign designed to obtain unconscionable and unenforceable releases from consumers injured by use of the Product. Upon information and belief, Unilever has solicited and obtained numerous releases from California consumers and others in the United States who were injured by use of the Product, without advising them of their right to obtain legal counsel to review the form releases that Unilever propounded and without fully explaining the terms or legal effect of the form releases, including that (a) the form releases purport to release third party retailers for no extra consideration; (b) the form releases purport to release personal injury claims for no extra consideration beyond the economic losses incurred by the consumer; (c) the form releases require consumers to indemnify Unilever for all

CLASS ACTION COMPLAINT

8

losses "from any and every claim or demand of every kind and character, including claims for contribution;" (d) the form releases require the consumer to indemnify Unilever from any claims for payment of medical expenses by Medicare/Medicaid; and (e) the form releases require the consumer to hold Unilever harmless "from any and all adverse consequences in the event this settlement results in the loss of right to Social Security and/or Medicare/Medicaid." The release forms that Unilever required its unrepresented consumers to sign — in order for them to get meager reimbursement from Unilever for as little as $50.00 for a haircut — contain terms that are so outrageous that they should be set aside as unconscionable and unenforceable.

**THE PARTIES**

17.     Plaintiff Wells resides in Hayward, Alameda County, California. She purchased and used the Product in Santa Clara County.

18.     At all times relevant to this Complaint, Plaintiff Reny resided in and currently resides in Wilmington, California. Reny purchased and used the Product in Los Angeles County.

19.     Defendant Unilever is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom. Unilever, which includes the Suave brand, is a Delaware corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Unilever manufactured, marketed, designed, promoted and/or distributed the Treatment.

20.     Knowlton Development Corporation ("Knowlton") is a foreign corporation with its principal place of business in Knowlton, Quebec, Canada. Defendant LEK, also a foreign corporation with its principal place of business in Knowlton, Quebec, Canada, is a subsidiary of Knowlton. LEK, formerly known as Les Emballages Knowlton, Inc., manufactured the Product for sale by Unilever in the United States, knowing that the Product would be sold in the United States, including California and nationwide, and thereby causing injury to California residents

CLASS ACTION COMPLAINT

and citizens and residents and citizens of other states as a direct result of the purchase and sale of said Product.

21.     Defendant Conopco is a New York corporation with its principal place of business located at 700 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Upon information and belief, LEK obtained a contract from Conopco for the manufacture of the Product, with LEK and/or Conopco being responsible for the distribution of the manufactured Product to retailers. At all times relevant hereto, Conopco knew or should have known that the Product would be sold in the United States.

**JURISDICTION AND VENUE**

22.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d), because this is a class action lawsuit in which over $5 million is at issue, there are more than 100 putative class members, and at least one class Member is a citizen of a state other than the state of citizenship of at least one of the Defendants.

23.     Venue is proper pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claims asserted occurred in this District, because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District, through the promotion, sale, and marketing of products in this District including the Product at issue in this case. Moreover, Plaintiffs purchased and used the Product in California and Plaintiff Wells purchased and used the Product in this District. Filed concurrently with this Complaint is the Declaration of Azra Z. Mehdi Pursuant to California Civil Code Section 1780(c) of the Consumer Legal Remedies Act, Cal. Civ. Code §1750, *et seq.*, which is incorporated by reference herein.

**FACTUAL ALLEGATIONS**

      **The Product and Product Warranties**

    24.    Unilever released Suave® Professionals Keratin Infusion 30-day Treatment on or about December 9, 2011. The Treatment was sold by Unilever directly and through retail shops to consumers nationwide, including specifically in California.

    25.    In promoting its new Treatment, for example on Walmart.com, Unilever stated: "Suave Professionals Keratin Infusion 30 Day Smoothing Kit is a simple, at-home alternative to expensive salon keratin treatments. This revolutionary system, formulated with keralock technology, infuses hair with keratin protein and leaves it smooth, shiny, and manageable for up to 30 days." The description continues by pointing out that the Product contains "No Formaldehyde."

    26.    The Walmart ad describes how the Product works: "Step 1: Smoothing Cream with keratin loosens, smoothens, And detangles curls And waves. Step 2: Cuticle Seal Cream with Keralock Technology reforms keratin bonds inside the hair fiber And eliminates frizz for long lasting smoothness And manageability. Step 3: Heat Defense Leave-In Conditioner provides ultimate moisturization to protect hair while heat styling. Formulated for use with blow dryers or flat irons for optimal shine and smoothness. Also, sold outside for continued use." A copy of the Walmart ad is attached as Exhibit A.

    27.    The Product states, on the front of the box, that the Treatment "Smooths Your Style as Well as a Keratin Treatment." Below that statement is printed in all caps: "NO FORMALDEHYDE." The package instructions state: "Your hair will continue to be smoother and easier to style for up to 30 days!" The package instructions further advise: "To complete the process, apply the Heat Defense Leave-In Conditioner and blow dry your hair into a smooth,

CLASS ACTION COMPLAINT

straight style. Flat iron if desired." A copy of the box labeling and instructions are attached as Exhibit B.

28.     Keratin is a protein found naturally in hair. By promoting the Treatment as a treatment that "infuses hair with keratin protein" and that did not contain Formaldehyde, Unilever warranted the Product as a safe, non-toxic hair smoothing solution that could be purchased at a fraction of the price of a salon treatment.

29.     However, despite the express representation that the Treatment contains no Formaldehyde, the Treatment does contain DMDM Hydantoin, a chemical that is known as a "Formaldehyde-releaser." *See* http://www.safecosmetics.org/article.php?id=599. Formaldehyde releasers are sometimes used in cosmetics in place of Formaldehyde and release amounts of Formaldehyde over time. Formaldehyde is a known human carcinogen.

30.     An investigation by the non-profit Environmental Working Group reported that some cosmetic companies disguise the Formaldehyde in their products by using, among other things, Formaldehyde releasers instead of Formaldehyde. *See* http://www.ewg.org/hair-straighteners/our-report/hair-straighteners-that-hide-formaldehyde.

31.     An average consumer reviewing the Unilever representation that the Treatment contains "No Formaldehyde" would not expect that it would contain a chemical known to release Formaldehyde upon use or application.

32.     Plaintiffs and the Class did not and would not expect that application of the Treatment would cause hair loss and scalp burns upon proper application.

33.     Plaintiffs and the Class reasonably expected a warning regarding any potential hazard to consumers, especially because the Food, Drug and Cosmetic Act regulations provide that cosmetics that may be hazardous to consumers must bear appropriate warnings. *See* http://www.fda.gov/Cosmetics/CosmeticLabelingLabelClaims.

CLASS ACTION COMPLAINT

34.     Contrary to the Food, Drug and Cosmetic Act regulations, the Product also failed to provide adequate directions for safe use, although Defendants knew or should have known the Product would be unsafe if used incorrectly. In fact, Unilever's website affirmatively represents that it complies with all applicable labeling laws. *See* Unilever's Code of Business Principles, attached as Exhibit C.

35.     Unilever's representations that the Product is safe, contains "No Formaldehyde," and would smooth hair for no longer than 30 days, was plainly false.

36.     In response to the damage customers have suffered after using this Product, consumers created a Facebook page entitle "Suave-Keratin-Infusion-Kit-Destroyed-my-Hair." The page describes:

> NIGHTMARES & HORROR Stories shared by VICTIMS of this product. Even if you haven't been affected, but can sympathize, please "LIKE" this page as it would be very helpful to those who have & continue to suffer as a result of Suave's negligence! THANK YOU!
>
> **Mission**
>
> The intent of this group is to, first and foremost WARN others about the potential damage and danger (yes, danger), but also in hopes to get the attention of Unilever (Suave)!
>
> PLEASE feel free to tell your stories in as much detail as you can. Pictures and videos will also be very helpful in garnering attention!
>
> Many, including myself, strongly believe that this product is falsely advertised, misleading, devoid of proper warnings, not safe for over-the-counter sales, should be reviewed by the FDA, and pulled from the market immediately.
>
> **ENDGAME:***
>
> GETTING THIS DANGEROUS PRODUCT DISCONTINUED OR RECALLED, AND *RECOMPENSE* FOR ALL THOSE WHO HAVE SUFFERED INJURIES, TRAUMA, AND THE LOSS OF THOUSANDS OF DOLLARS SPENT ON REPAIRS — A DIRECT RESULT OF BEING INTENTIONALLY MISLEAD BY UNILEVER, AND THEIR NEGLIGENCE.

CLASS ACTION COMPLAINT

13

**Description**

This group was created for people who have had horrible experiences with the "Suave Professionals Keratin Infusion 30 Day Smoothing Kit," and who need a place to tell their stories, vent, cry, scream, or receive support and empathy from others who have been likewise traumatized.

37.    There are hundreds of posts highlighting the "horror stories" of women who used the Treatment. These stories are strikingly similar to Plaintiffs' experiences. These consumers describe how they were misled by Unilever's representations about the Product, expecting a Keratin-based smoothing Treatment whose effects would last no longer than 30 days, but instead received a toxic hair straightener that caused hair loss and other adverse effects.

38.    Upon information and belief, as early as December 2011 Unilever became aware of the serious adverse effects resulting from use of the Treatment, such as hair loss and chemical burns. However, despite that knowledge, Unilever remained silent, knowingly failed to warn distributors or the public of the problems caused by the Treatment and continued selling the Treatment with the same express warranties and without appropriate warnings.

39.    On the day the Product was "recalled," Unilever explained on a website listing numerous recalled products that the Treatment was taken off the market "because of potential consumer misunderstanding of the product's suitability for certain hair conditions." Unilever admitted that consumers "misunderstood" the Treatment, which misunderstanding was caused by Unilever's false marketing of the Treatment as, among other things, a temporary hair smoothing product, not a long-lasting toxic chemical relaxer that could cause hair loss and other damage.

40.    The Food and Drug Administration (FDA), on its website at http://www.fda.gov/Safety/Recalls/EnforcementReports/ucm307229.htm, indicates that the Treatment was recalled by Unilever by letter dated May 8, 2012. The FDA website notes that there were 381,288 kits in commerce nationwide that were recalled. The FDA website further

notes that the Treatment was manufactured by Les Emballages Knowlton, Inc., now known as LEK, a subsidiary of Knowlton.

41.     Retailers were advised by Unilever to immediately cease distribution of the Product and were advised to send the Product back to Unilever. Upon information and belief, some retailers continued to sell the Product after the recall and to this day, more than a year after the so-called recall, it is still available for sale.

42.     In recalling the Product, Unilever did not make any public announcement and did not publicly respond to the numerous complaints of adverse incidents associated with its use. Instead, Unilever posted a simple notice on its website indicating that the Treatment had been "discontinued" and requesting that customers call for additional information.

43.     Defendant LEK did nothing in connection with the recall despite the reference to LEK as the "manufacturer" in connection with the FDA's notice of recall.

44.     Unilever continues to this day to advise consumers that the Product is safe to use as directed, without providing any disclosure concerning the complaints of hair loss and with no warnings regarding the hair loss that may result from its continued use. *See* http://keratininfusion.suave.com/us/base/howto#productFaqs. Indeed, despite the so-called "recall" and Unilever's knowledge and awareness of hundreds if not thousands of complaints of significant hair loss and breakage caused by the Product, Unilever continues to claim it is safe and permits it to be sold to this day — without providing consumers with ***any*** revised warnings or disclosures.

45.     Unilever actively and intentionally misled consumers by telling consumers the Product was safe to use while at the same time telling retailers to immediately recall the Product and to bar sales of the Product sitting on their shelves.

CLASS ACTION COMPLAINT

15

46.     Unilever's Code of Business Principles, Exhibit C, states that Unilever "complies with laws and regulations of the countries in which they operate." It further provides that Unilever is "committed to providing products which are safe for their intended use. Products and services will be accurately and properly labeled, advertised and communicated."

47.     Unilever also makes the following representations on its website, portions of which are attached as Exhibit D:

- "Consumers trust us to provide them and their families with products that are safe."

- "[P]rotecting consumers' safety is our number one priority."

- "We realise innovation is key to our progress, and through cutting-edge science we're constantly enhancing our brands, improving their nutritional properties, taste, fragrance, or functionality. We invest nearly €1 billion every year in research and development, and have established laboratories around the world where our scientists explore new thinking and techniques, applying their expertise to our products. Consumer research plays a vital role in this process. Our unrivalled global reach allows us to get closer to consumers in local markets, ensuring we understand their diverse needs and priorities."

- "On any given day, two billion people use Unilever products to look good, feel good and get more out of life."

**Defendants' Conduct with Respect to the Hazard Posed by the Product**

48.     The active ingredient in the Product, Thioglycolic Acid, including its salts and esters, was originally developed as a depilatory agent for uses such as removing animal hair from hides so that a processor could transform a hairy hide into leather capable of being processed. Thioglycolic Acid is so corrosive that, if left on too long, it will dissolve the bonds holding hair together until the hair strand is transformed into a jelly-like substance that can be wiped away.

49.     Designing, manufacturing and providing a direct-to-consumer hair conditioning with Thioglycolic Acid, at the pH levels and concentration in the Product, was unreasonably

CLASS ACTION COMPLAINT

dangerous and unsafe to consumers, especially when marketed as a gentle, "smoothing" hair conditioning treatment.

50.     Upon information and belief, Les Emballages Knowlton, now known as Defendant LEK, manufactured the Product for Unilever.

51.     On its website, LEK boasts that it is "strategically positioned twenty minutes from the US-Canada border — immediately north of the US eastern states" in an obvious attempt to solicit and obtain U.S. business. The website continues by explaining that "LEK is a highly flexible manufacturing environment designed to meet the needs of mass brands; from new product introductions, to brand growth, as well as the continuous improvement needs of mature brands. Highly capable in the production of liquid and solid products, LEK is recognized by the market as a leader in large-scale hot pour capabilities, boasting some of the best expertise in the manufacture of anti-perspirants and deodorants in the world." *See* http://www.kdc-companies.com/kdc/lek.php.

52.     Under the heading "Team" the website continues to claim that the organization is "best in class in planning and introducing new products to the mass market, as well as introducing cost improvement programmes that secure a product's profitability over its life-cycle. Since 1991, LEK has been a stable partner to some of the most important brand-owners in the world, as its management and operational teams continue to refine their approach to managing the complexity of the consumer packaged goods industry." *Id.*

53.     Based upon LEK's own representations, it claimed to have the expertise and ability to manufacture a safe and effective Product for Unilever. Despite its purported expertise, it failed to perform adequate testing to determine that the Product, at the pH and concentrations in which it was offered for sale, was dangerous and unfit for sale directly to consumers. Despite its purported expertise in managing "new product introductions," LEK permitted the Product to

CLASS ACTION COMPLAINT

17

be sold with incomplete and inaccurate instructions and warnings, and although as a manufacturer it owes a duty of care to Plaintiffs and all putative Class Members, LEK failed to properly warn or advise potential consumers of the risk attendant with use of the Product.

54.     Instead, upon information and belief, LEK (with Unilever and Conopco) knowingly permitted the manufacture and sale of a Product that was dangerous and unfit for sale as a temporary hair "smoothing" Product.

55.     Prior to Plaintiffs' purchase of the Product, Defendants were aware or should have been aware that the Treatment contained an inherent defect that caused significant hair loss and scalp burns upon proper application and that any instructions and warnings provided with the Product directly to consumers were materially insufficient.

56.     Defendants Unilever and LEK knew, or but for their reckless indifference would have known, prior to Plaintiffs' purchases of the Product that they would continue to receive complaints of hair loss attributed to the Product. Based on their experience, Defendants knew or should have known that even if they diligently investigated the problem, it would be difficult if not impossible to remediate the problem.

57.     Unilever knew, or but for its reckless indifference would have known, that: (a) the risk of scalp burns and hair loss was substantial, (b) Unilever's customers were unaware of that substantial risk, and (c) those customers had a reasonable expectation that Unilever would not sell the Product under those conditions.

58.     Despite such knowledge, Unilever did not disclose to prospective purchasers, before or after the so-called recall, that there was a substantial risk of scalp burns and hair loss associated with use of the Product. Unilever instead continued to claim the Product was safe, while concealing all the adverse reports filed by consumers. Unilever told consumers that the Product was discontinued because of consumer "confusion," not because users of the Product

were losing their hair and burning their scalps. This deception and cover-up continues to this day.

**FACTS RELATING TO NAMED PLAINTIFFS**

59.     Plaintiff Wells purchased the Treatment in or about January 2012. Based on Unilever's representations, she expected to be purchasing a short-term "smoothing" conditioner and not a harsh chemical relaxer which contained the same active ingredient that is used in hair removal products. Wells was exposed to and familiar with Unilever's claims about the Treatment not containing Formaldehyde and being a "smoothing" Product whose effects would last no longer than 30 days. Each of these representations were set forth prominently on the box in which the Treatment was sold. She purchased the Treatment for approximately $15.00 at a Target in Sunnyvale, California.

60.     After proper application of the Treatment, Wells noticed her hair breaking at the crown and she experienced significant hair loss at the crown and on the sides of her head. Because of the breakage and hair loss, she has had to cut approximately ten inches off her hair and has spent thousands of dollars on weaves, hair extensions, and other treatments to attempt to restore the damage to her hair. The straightening effects and damage to Wells' hair continues to this day - nearly two years after she used the Product. Her once long, beautiful, natural curly healthy hair is now dull, fragile and short. Her hair is extremely thin and the bald spots caused by the Treatment are still visible.

61.     Plaintiff Reny purchased the Treatment in or about May 2012. Reny was familiar with Keratin-based hair treatments and believed the Product would be a good value compared to expensive salon Keratin-based treatments. Reny was exposed to and familiar with Unilever's claims about the Treatment being a "smoothing" Product whose effects would last no longer than

CLASS ACTION COMPLAINT

19

30 days. She paid approximately $15.00 for the Treatment, which she purchased at an Albertson's in California.

62.    Reny reviewed the Product instructions and so-called warnings and applied all three steps as instructed by Unilever's package inserts. Immediately upon application, the Product started "melting" her hair and it was breaking and falling out. Her hair became dry and brittle and she was unable to even comb it out.

63.    Reny has had to cut off approximately four inches of her hair and has spent hundreds of dollars on treatments and conditioners to attempt to repair the damage caused by the Product. To this day, her hair is much thinner than it was and she still has a visible bald spot caused by the Product.

64.    Plaintiffs purchased the Treatment because of Unilever's false representations about what the Product offered them, and because they were unaware that the Treatment was unsafe and would cause hair loss and scalp burns, among other effects.

65.    Plaintiffs provided pre-suit notice to Defendants of their warranty claims and Defendants had actual notice of the alleged defect and harm caused by the Product.

**CLASS ALLEGATIONS**

66.    Plaintiffs bring this action on behalf of themselves and all persons within the United States who purchase the Product for personal or household use at any time since the date in 2011 that the Product was first made available to consumers (the "Multistate Class"). Excluded from the Multistate Class are persons who reside in the States of Kentucky, Illinois,

Nevada, Wisconsin and Alabama who purchased the Product for personal or household use at any time since the date in 2011 that the Product was first made available to consumers.[2]

67.     In the alternative, Plaintiffs bring this action on behalf of themselves and all California residents who purchased the Product for personal or household use at any time since the date in 2011 that the Product was first made available to consumers (the "California Class." Together, the California and alternative Multistate Class are referred to herein as the "Class."

68.     Excluded from the Class are: Defendants, any entities in which Defendants have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such persons' immediate families, the presiding judge(s) in this case and his, her or their immediate family, and those who purchased the Treatment for resale, their legal counsel and anyone employed thereby. Plaintiffs reserve the right to amend the definition of the Class if discovery or further investigation reveals that the Class should be expanded or otherwise modified.

69.     Plaintiffs and the members of the Class are so numerous and geographically disperse that joinder of all members individually, in one action or otherwise, is impractical. Unilever's national marketing and advertising campaigns target consumers across the country. The precise number of Class members and their identities are unknown to Plaintiffs at this time but will be determined through discovery. Class members may be notified of the pendency of this action by mail and/or publication.

70.     Upon information and belief, the Defendants sold tens of thousands of Treatment kits to California residents. Plaintiffs and the members of the Class they seek to represent are so

---

[2] Class actions have been filed in Illinois and in Kentucky on behalf of the residents of the five states excluded from this Action.

CLASS ACTION COMPLAINT

numerous that joinder of all members individually, in one action or otherwise, is impractical. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery and other means. Class Members may be notified of the pendency of this action by mail and/or publication.

71.     This action involves questions of law and fact common to Plaintiffs and all members of the Class, which include the following:

(a)     Whether the Treatment contains the defect alleged herein;

(b)     Whether Defendants failed to appropriately warn Class Members of the damage that could result from use of the Product;

(c)     Whether Defendants had actual or imputed knowledge of the defect but did not disclose it to Plaintiffs or the Class;

(d)     Whether Unilever promoted the Product with false and misleading statements of fact and material omissions;

(e)     Whether the alleged conduct constitutes violation of the laws or regulations asserted herein;

(f)     Whether Plaintiffs and Class Members sustained damages resulting from Defendants' conduct and, if so, the proper measure of damages or other relief.

72.     These and other questions of law and/or fact are common to the Class and predominate over any questions affecting only individual Class Members.

73.     The claims of the named Plaintiffs are typical of the claims of the proposed Class, and Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to, or which directly conflict with, the interests of the other members of the Class.

CLASS ACTION COMPLAINT

22

74.     Plaintiffs have engaged the services of counsel who are experienced in complex class litigation, who will adequately prosecute this action, and who will assert and protect the rights of and otherwise represent Plaintiffs and the absent Class Members.

75.     Plaintiffs' claims are typical of those of the absent Class Members in that Plaintiffs and the Class Members each purchased and used the Treatment and each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein.

76.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The expense and burden of individual litigation would make it impracticable for proposed Class Members to prosecute their claims individually.

77.     Plaintiffs submit that there will be fewer difficulties in the fair, efficient and cost-effective management of this action or the common issues therein as a class action, and there will be benefits to and protections of the legitimate interests of the parties, the court and the public with the maintenance of this action as a class action than there would be under any other procedural alternative. Means exist to address any individual issues of injury and damages involved in fair and adequate compensation for the Class, after common issues relating to Defendants' Product, conduct, knowledge, duties and breach thereof have been adjudicated. Claims processes may also be employed to fashion and implement an expeditious remedy for the Class.

78.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

79.     Defendants have acted or failed to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

80. Without a class action, Defendants will continue a course of action that will result in further damage to Plaintiffs and the Class and will likely retain the benefits of their wrongdoing.

81. Based on the foregoing allegations, Plaintiffs' claims for relief include those set forth below:

## COUNT I

### Breach of Express Warranty
### Against Unilever Only

82. Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

83. Plaintiffs and each member of the Class formed a contract with Unilever at the time Plaintiffs and the other Class Members purchased the Treatment. Unilever is a merchant engaged in the business of selling, among other things, hair treatment products. Unilever, as the designer, manufacturer, distributor and/or seller of the Product at issue herein made certain express warranties through advertising and packaging, as set forth herein. This marketing, packaging and advertising constitute express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiffs and the members of the Class and Unilever.

84. Unilever purports through its advertising and packaging to create express warranties that the Treatment was a hair "Smoothing" Product and not a chemical relaxer, that the effects of the Treatment would last no more than 30 days, and that it contained No Formaldehyde and was safe.

85. All conditions precedent to Unilever's liability under this contract were performed by Plaintiffs and the Class when they purchased the Product and used it as directed.

CLASS ACTION COMPLAINT

86.     Unilever breached express warranties about the Treatment and its qualities because Unilever's statements about the Product were false and because the Product does not conform to Unilever's affirmations and promises described above. Plaintiffs and the Class relied on Unilever's representations and would not have purchased the Product had they known the true nature of the Treatment and the mis-statements regarding what the Product was and what it contained.

87.     As a result of Unilever's breach of warranty, Plaintiffs and the Class have been damaged in the amount of the purchase price of the Product and any consequential damages resulting from the purchases, including but not limited to the cost to repair their hair loss.

## COUNT II

**Breach of Implied Warranty
Against All Defendants**

88.     Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

89.     At all times relevant hereto, there was a duty imposed by law which requires that a manufacturer's or seller's product be reasonably fit for the purposes for which such products are used, and that product be acceptable in trade for the product description.

90.     Notwithstanding the aforementioned duty, at the time of delivery, the Treatment sold to Plaintiffs was not merchantable because it contained a defect that caused hair loss upon proper application and did not otherwise perform as represented and for the particular purpose for which it was intended.

91.     Defendants were notified that the Treatment was not merchantable or fit for its intended purpose within a reasonable time after the defect manifested to Plaintiffs and the Class.

92.     As a result of the breaches of the implied warranty of merchantability and/or implied warranty of fitness for a particular purpose, Plaintiffs and the Class sustained damages.

CLASS ACTION COMPLAINT

25

## COUNT III

**Violation of the Song-Beverly Consumer Warranty Act for Breach of Implied Warranty Against All Defendants on Behalf of the California Class**

93.     Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

94.     Plaintiffs and members of the California Class are "retail buyers" within the meaning of Section 1791(b) of the California Civil Code.

95.     The Treatment is a "consumer good" within the meaning of Section 1791(a) of the California Civil Code.

96.     Defendants are "manufacturers" within the meaning of Section 1791(j) of the California Civil Code.

97.     Defendants specifically marketed the product as a "Smoothing" treatment that would last for no longer than 30 days, contained no Formaldehyde, and was safe for at-home use. Defendants knew or should have known that the California Class would reasonably rely on Defendants' skill or judgment to select or furnish suitable goods.

98.     Plaintiffs and the California Class did in fact purchase the Treatment with the particular purpose of temporarily smoothing their hair with a keratin-based conditioner and Plaintiffs and other members of the California Class did in fact reasonably rely on Defendant's skill or judgment to furnish suitable goods.

99.     Defendants breached the implied warranty of fitness for a particular purpose by distributing a defective and dangerous Product, by failing to provide sufficient warnings for such a Product, and by continuing to fail to do so long after Defendants knew or should have known of the risks associated with the Product.

CLASS ACTION COMPLAINT

100.     Moreover, Defendants breached the implied warranty of merchantability because the Treatment was defective and unsafe and not fit for the ordinary purpose for which it was intended.

101.     Defendants' failure to warn of the Product's dangers was willful.

102.     As a proximate result of Defendants' breach of implied warranties, Plaintiffs and members of the California Class sustained damages. Plaintiffs are entitled to damages, civil penalties and other legal and equitable relief including a right of reimbursement, as well as costs, expenses and attorneys' fees.

## COUNT IV

**Violation of Cal. Bus. & Prof. Code Section 17200 *et seq*. and
Similar Consumer Protection Statutes in Other States
Against Unilever**

103.     Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

104.     Plaintiffs and the Class Members are consumers entitled to the protections of California Business and Professions Code §17200 *et seq*. which prohibits the commission of any "unlawful, unfair or fraudulent business act or practice." Similar statutes, identical in their material respects, are in effect in most other jurisdictions within the United States.[3]

105.     Unilever's misrepresentations and withholding of the material facts set forth above defrauded the general public through deceit, fraud and/or negligent misrepresentation in

---

[3] The consumer fraud claims of Plaintiffs and absent class members who reside in California and purchased the Product for personal or household use at any time since the date in 2011 that the Product was first made available to consumers are brought under California Business and Professions Code §17200, *et seq*. The consumer fraud claims of absent class members who reside in any of the states other than California that comprise the Multistate Class are brought under the consumer protection statutes of their respective states of residence.

CLASS ACTION COMPLAINT

violation of California Civil Code §§1572, 1709 and 1710, and California Business and Professions Code §17500, *et seq.*, as well as other similar consumer protection statutes and principles of common law. Thus, Defendant's conduct constitutes unlawful practices under the UCL and similar consumer protection statutes in effect throughout the country.

106.    As detailed above, Unilever, through its advertisements and packaging, used unconscionable commercial practices, deception, fraud, false promises and misrepresentations in connection with the marketing of the Treatment.

107.    Unilever also knowingly concealed, suppressed and consciously omitted material facts from Plaintiffs and other members of the Class knowing that consumers would rely on the advertisements and packaging and Unilever's uniform representations to purchase the Product.

108.    Because of Unilever's fraudulent concealment and deception, even after the so-called "recall," Plaintiffs did not and could not have become aware of any facts which would have called into question the false public perception of safety which Unilever had created.

109.    Until the present, Unilever knowingly accepted the benefits of its deception and improper conduct in the form of profits from the increased sale of the Product.

110.    In addition, and upon information and belief, Unilever has continued to defraud consumers in California and nationwide by soliciting and obtaining signatures from unrepresented consumers on form releases that are oppressive and unconscionable for, among other reasons: (i) the releases fail to advise consumers anywhere on the release form, of the important legal consequences of releasing all claims related to their purchase and/or use of the Treatment; (ii) the releases require consumers to indemnify Unilever under conditions that are unfair and oppressive; (iii) the releases purport to waive claims for third party retailers, for no additional consideration and without explanation; and (iv) the releases purport to release personal

injury claims without providing any additional consideration beyond providing reimbursement of economic losses actually sustained by consumers.

111.    Upon information and belief, Unilever's representatives provided false and/or incomplete information to unrepresented consumers in order to obtain signed releases, including but not limited to representations that diminish the legal significance and consequences of the releases.

112.    Defendant's labeling, advertising and sale of its Product that contain Thioglycolic Acid and other harsh chemicals constitute unfair business acts and practices under the UCL and similar consumer protection statutes in effect throughout the country because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to its customers in that Defendant deceptively, misleadingly, unfairly and unlawfully claims that certain of its products are free of Formaldehyde and other harsh chemicals, and are safe when, in fact, they are not safe and not free of Formaldehyde and other harsh chemicals.

113.    That conduct has caused substantial injury to Plaintiffs and the Class including that they expended money for a Product that did not contain the benefits that were claimed, and additional losses in repairing and attempting to restore the damage caused by the Product. The injuries suffered by Plaintiffs and the Class are not outweighed by any countervailing benefits to Defendant or competition in general and could not have been reasonably avoided by Plaintiffs and the Class.

114.    All of the conduct alleged herein occurred in the course of Defendant's business. Defendant's wrongful conduct was part of a pattern or generalized course of conduct.

115.    Plaintiffs and members of the Class suffered injury in fact and lost money and were otherwise damaged as a result of the practices complained of herein in that they would not

CLASS ACTION COMPLAINT

29

have purchased the Product at issue and/or paid as much for the Product had they known that it was not safe and was misrepresented as set forth herein. Meanwhile, Defendant sold more of the Product than they otherwise would have and enriched themselves thereby.

116.    As a result of their unlawful, unfair and fraudulent conduct described above, Defendant has been and will be unjustly enriched by the receipt of millions of dollars in ill-gotten gains. In addition, the unlawful, unfair and fraudulent business practices set forth above present a continuing threat to members of the public in that Defendant continues to engage in the conduct described above. Defendant should be enjoined from continuing to claim the Product is safe and enjoined from continuing to permit the sale of the Product based on the same misrepresentations set forth herein. In addition, the misleading, unconscionable and unfair releases fraudulently procured by Defendant from unrepresented Class members should be set aside.

## COUNT V

**Deceptive Advertising Practices in Violation of Cal. Bus. & Prof. Code Section 17500 et *seq*. Against Unilever on Behalf of the California Class**

117.    Plaintiffs hereby incorporate the above allegations by reference as though fully set forth herein.

118.    California Business and Professions Code §17500 prohibits "unfair, deceptive, untrue or misleading advertising."

119.    Defendant violated California Business and Professions Code §17500 by, *inter alia*, misleadingly advertising that certain of its products were Formaldehyde free and were safe, and by concealing material information about the true nature of its Product and the safety risks attendant with its use.

120.    Defendant's deceptive practices were specifically designed to induce Plaintiffs and Class members to purchase the Treatment over those of its competitors. Defendant's

CLASS ACTION COMPLAINT

deceptive practices were carried out on Defendant's website, through broad-based media and on its packaging and advertising.

121.    The content of the advertisements and packaging, as set forth herein, were of a nature likely to deceive a reasonable consumer.

122.    Defendant knew or in the exercise of reasonable care should have known that the representations were untrue or misleading and likely to deceive reasonable consumers.

123.    Defendant's misrepresentations and omissions alleged herein, which continue to the present, and continue despite the so-called Product recall, are objectively material to the reasonable consumer, and reliance upon such misrepresentations and omissions may therefore be presumed as a matter of law. The unlawful, unfair and fraudulent business practices set forth above present a continuing threat to members of the public in that Defendant continues to engage in the conduct described above.

124.    Unless restrained by this Court, Defendant will continue to engage in misleading marketing and will continue to permit the Product to remain on the market without disclosing the significant safety attendant to its use.

125.    As a result of the foregoing, Plaintiffs and members of the Class have been injured and lost money or property, and they are entitled to restitution and injunctive relief.

## COUNT VI

**Violation of Consumer Legal Remedies Act, Cal. Civ. Code Section 1750, *et seq.*
Against Unilever on Behalf of the California Class**

126.    Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

127.    The California Consumer Legal Remedies Act, Section 1750 of the California Civil Code, protects consumers against fraud, unlawful practices, and unconscionable commercial practices in connection with the sale of any merchandise.

CLASS ACTION COMPLAINT

128.    Plaintiffs are "consumers" within the meaning of Civil Code Sections 1761(d) and 1770 because they sought or acquired Defendant's goods for personal, family or household purposes.

129.    The Treatment is a "good" within the meaning of Section 1761(a) of the California Civil Code.

130.    Unilever manufactured (with LEK or as overseer of LEK), distributed and falsely marketed the Treatment as a product that is safe to use when in fact it contains a corrosive depilatory agent that in fact causes hair to "melt" and break and fall out and is therefore unreasonably dangerous and unfit for ordinary uses. Such conduct violates the California Consumer Legal Remedies Act.

131.    Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by Section 1770(a), subsections (5), (7), (9) and (16) of the California Civil Code in transactions with Plaintiffs and the California Class, which were intended to result in, and did result in, the sale of the Treatment, in that Defendant: represented that the Treatment had characteristics, uses and benefits which it did not have; represented that the Treatment was of a particular standard, quality, and grade when it was of another; advertised the Treatment with the intent not to sell it as advertised, and represented that the Treatment had been supplied in accordance with previous representations when it had not.

132.    Plaintiffs and the California Class reasonably relied upon and were deceived by Defendant's representations that the Treatment was safe and defect-free and fit for ordinary use. The misrepresentations made by Defendant and the omissions regarding the safety risks of the Product were material in that no reasonably consumer would have purchased the Treatment had they been aware of the true facts.

CLASS ACTION COMPLAINT

32

133.    Defendant also violated Section 1770(a) subsections (14) and (19) by misleading unrepresented consumers into signing what Unilever purported to be a full and final release of all claims, including personal injury claims, related to their purchase and use of the Treatment, for no consideration beyond repayment of nominal expenses the customer had incurred, and by inserting unconscionable provisions in the purported releases mentioned above, such as requiring unrepresented consumers to agree to indemnify Unilever from any claims for payment of medical expenses by Medicare/Medicaid certain claims.

134.    As a proximate and direct result of Defendant's misrepresentations and unlawful and unconscionable commercial practices, Plaintiffs and members of the California Class have been injured and suffered damages.

135.    Pursuant to Section 1782(d) of the California Civil Code, Plaintiffs, on behalf of themselves and the California Class, seek a Court order enjoining Defendant from such future conduct and any other such orders that may be necessary to rectify the fraudulent, unlawful and unconscionable commercial practices of Defendant, including requiring Defendant to fully and appropriately recall the Product.

136.    Plaintiff Reny, on behalf of herself and the California Class, including Plaintiff Wells, has complied with California Civil Code Section 1782(a) by serving a preliminary notice before filing a complaint for damages under the Consumers Legal Remedies Act, Cal. Civil Code Section 1750, *et seq.* Thirty days have elapsed since Plaintiffs issued such a demand and Defendant has failed to make an appropriate correction, repair, replacement or other remedy.

137.    Pursuant to the provisions of Cal. Civ. Code Section 1780, Plaintiffs on behalf of themselves and the California Class members seek injunctive relief, restitution, compensatory and punitive damages pursuant to Cal. Civil Code Sections 1780, 1782(b) as requested herein, and any other relief this Court deems appropriate.

## COUNT VII

### Violation of Magnuson-Moss Act (15 U.S.C. Section 2301 *et seq.*)
### Against Unilever Only

138.    Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

139.    Plaintiffs and the Class are consumers as defined in 15 U.S.C. §2301(3).

140.    Unilever is a supplier and warrantor as defined in 15 U.S.C. §2301(4)(5).

141.    The Treatment is a consumer product as defined in 15 U.S.C. §2301(6).

142.    By reason of Unilever's breach of warranties as set forth above, Unilever has violated the statutory rights due to the Plaintiffs and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §2301, *et seq.*, thereby damaging Plaintiffs and the Class.

143.    Unilever expressly warranted to Plaintiffs and Class members that the Product was of merchantable quality and fit for the ordinary purpose for which smoothing kits are used.

144.    Unilever purports through its advertising and packaging to create express warranties that the Treatment is a hair "Smoothing" product and not a chemical relaxer, that the effects of the Product would last no more than 30 days, and that it contained no Formaldehyde and was safe.

145.    Unilever breached its express warranties because its statements about the Product were false and the Product does not conform to Unilever's affirmations and promises described above. Plaintiffs and Class members would not have purchased the Product had they know the true nature of the Treatment and the mis-statements regarding what the Product was and what it contained.

146.    Unilever refuses to recognize or honor its warranties. Unilever breached its express warranties as the defective Product was not of merchantable quality and failed to perform in the express purpose for which it was used.

147.   The amount in controversy for each Plaintiff and Class member's individual claim meets or exceeds $25.00 including the cost of the Product and consequential damages. In addition, the amount in controversy exceeds $75,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit.

148.   As a result of Unilever's breach of warranty, Plaintiffs and Class members have sustained damages and losses in an amount to be determined at trial. Plaintiffs and the Class are entitled to damages, costs, attorney's fees, rescission and other relief as appropriate.

## COUNT VIII

### Negligence and/or Gross Negligence
### Against All Defendants

149.   Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

150.   Defendants owed Plaintiffs a duty to use due care in their development, testing, planning, design, marketing, sale and recall of the subject hair care Product offered for use by consumers.

151.   Through their failure to exercise due care, Defendants breached this duty by producing, processing, manufacturing, distributing and/or offering for sale a Product in a defective condition that was unsafe for unsupervised use at home by consumers.

152.   Additionally, Defendants breached their duty of care to Plaintiffs by failing to use sufficient quality control, perform adequate research or testing, proper manufacturing, production or processing, and failing to take sufficient measures to prevent the Product from being offered for sale in an unsafe and hazardous form.

153.   Defendants further breached their duty of due care by failing to properly and adequately inform consumers once safety concerns, including hair loss and chemical burns, were brought to the Defendants' attention, by making affirmative representations about the Product

without reasonable grounds for believing the representations were complete and accurate, by omitting material information from consumers, and Defendants further breached their duty of care by failing to fully and appropriately recall the Product.

154.    Defendants knew, or in the exercise of reasonable care should have known, that the Product presented an unacceptable risk to consumers, and would result in damages that were foreseeable and reasonably avoidable.

155.    As a direct and proximate result of Defendants' above-referenced negligence and/or gross negligence, Plaintiffs and the Class have suffered and are entitled to recover damages, both compensatory and punitive.

## COUNT IX

### Strict Liability
### Against All Defendants

156.    Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

157.    Defendants are producers, manufacturers, marketers and/or distributors of the Product.

158.    Defendants produced, manufactured, designed, marketed and/or distributed the Product that was defective in design or formulation in that, when the Product left the hands of Defendants, the foreseeable risks of harm exceeded the benefits associated with the design or formulation.

159.    Defendants' Product was expected to, and did, reach Plaintiffs without substantial change in condition.

160.    Alternatively, the Product manufactured, designed, marketed and/or supplied by Defendants was defective in design or formulation in that, when it left the hands of Defendants,

CLASS ACTION COMPLAINT

it was unreasonably dangerous, more dangerous than an ordinary consumer would expect without concomitant accurate information and warnings accompanying the Product.

161.    Defendants researched, produced, manufactured, designed, marketed and/or distributed the Product that was defective due to inadequate warning, testing, study and/or reporting regarding the results of such efforts.

162.    Defendants produced, manufactured, designed, marketed and/or distributed the Product that was defective due to inadequate post-market warning or instruction because, after Defendants knew or should have known of the risk of injury from the recalled Product, Defendants failed to immediately provide adequate warnings to Plaintiffs and the California public.

163.    As the direct and legal result of the defective condition of the Product as produced, manufactured, designed, marketed and/or distributed by Defendants, and of the negligence, carelessness, other wrongdoing and actions of Defendants described herein, Plaintiffs and the Class suffered damages.

## COUNT X

### Unjust Enrichment
### Against All Defendants

164.    Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

165.    Plaintiffs and Class Members conferred a benefit on Defendants by purchasing the Treatment.

166.    Defendants have been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Treatment, which retention of such revenues under these circumstances is unjust and inequitable because Defendants manufactured a defective Product, and Unilever misrepresented the nature of the Product, misrepresented its ingredients, and

CLASS ACTION COMPLAINT

37

knowingly marketed and promoted a dangerous and defective Product, which caused injuries to Plaintiffs and the Class because they would not have purchased the Treatment based on the same representations if the true facts concerning the Product had been known.

167.   Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and the Class Members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class Members for their unjust enrichment, as ordered by the Court.

WHEREFORE, Plaintiffs, individually and on behalf of the Class of persons described herein, themselves and all others similarly situated, respectfully request the following relief:

A.   An Order certifying the Class as defined above;

B.   An award of restitution and other appropriate equitable relief;

C.   An injunction against Unilever to enjoin it from conducting its business through the unlawful, unfair and fraudulent acts or practices set forth herein;

D.   An Order setting aside the fraudulent releases obtained by Unilever;

E.   An Order requiring Unilever to fully and appropriately recall the Product, to remove the claims on its website and elsewhere that the Product is safe to use, and to fully and properly disclose the safety risks associated with the Product to anyone who may still be at risk of buying and using the Product;

F.   A jury trial and damages according to proof;

G.   Reasonable attorney's fees and costs;

H.   Civil penalties, prejudgment interest and punitive damages as permitted by law; and

I.   Such other and further relief as the Court deems appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiffs, on behalf of themselves and on behalf of the Class, demand a trial by jury of all claims asserted in this Complaint so triable.

DATED: October 11, 2013                      THE MEHDI FIRM, PC

                                             /s/ Azra Z. Mehdi
                                             AZRA Z. MEHDI
                                             One Market
                                             Spear Tower, Suite 3600
                                             San Francisco, CA 94105
                                             (415) 293-8039
                                             (415) 293-8001 (fax)
                                             azram@themehdifirm.com

                                             Local Counsel for Plaintiffs and the [Proposed]
                                             Class

                                             PETER SAFIRSTEIN
                                             ELIZABETH S. METCALF
                                             MORGAN & MORGAN, P.C.
                                             Five Penn Plaza, 23rd Floor
                                             New York, NY 10001
                                             (212) 564-1637
                                             (212) 564-1807 (fax)
                                             psafirstein@forthepeople.com
                                             emetcalf@forthepeople.com

                                             CHRISTOPHER S. POLASZEK
                                             MORGAN & MORGAN, P.C.
                                             One Tampa City Center
                                             201 N. Franklin Street, 7th Floor
                                             Tampa, FL 33602
                                             (813) 314-6484
                                             (813) 222-2406 (fax)
                                             cpolaszek@forthepeople.com

                                             JANA EISINGER
                                             LAW OFFICE OF JANA EISINGER, PLLC
                                             11 West Prospect Avenue
                                             Mount Vernon, NY 10550
                                             (914) 418-4111
                                             (914) 455-0213 (fax)
                                             Jana.Eisinger@gmail.com

                                             Counsel for Plaintiffs and the [Proposed] Class

CLASS ACTION COMPLAINT